RONNIE ADAMS *v.* STATE OF MARYLAND

[No. 102, September Term, 1969.]

*Decided February 12, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Leonard A. Briscoe* for appellant.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert C. Ozer, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

A life sentence was imposed upon a thirteen year old boy, Ronnie Adams, after his conviction of first degree murder in a non-jury trial in the Criminal Court of Baltimore.

The record discloses that sometime before midnight on the evening of June 1, 1968, Charles A. Snyder, while operating a Baltimore Transit Company bus, was shot and killed in the course of a holdup. Two days later, appellant was surrendered to the police by his mother who also gave them a .32 caliber revolver which was later proven to be the murder weapon. Ronnie Adams gave a written statement to the police, which was introduced into evidence without objection, in which he admitted that he had taken his mother's gun from their home earlier in the evening of the crime, joined his friend Ryor Mills, aged sixteen years, and both met up with another friend, Earl Hill, in front of a shop at the intersection where the crime occurred; and that just prior to the holdup he had given the gun to a girl whom he had seen across the street and that immediately thereafter "I heard Earl say to Ryor, 'Do you want to hold up a bus?' and Ryor said to Earl, 'If you want to.' And this is when Ryor got the gun from the girl." His statement continued: "The girl gave Ryor the gun and as she was handing the gun to Ryor the number [sic] bus was coming up Fayette Street and caught the light at the corner of Fayette and Fremont. After this I started to walk over towards the Dixie shop and as I was doing this, I saw Earl and Ryor get on the bus. After Earl and Ryor got on the bus I saw Ryor through the front window pulled [sic] the gun from out of the waist of his pants and point it at the bus driver who was sitting in the driver's seat. And then the bus driver swung at hand that Ryor had the gun in and then Ryor shot him. Then Ryor reached down on the floor of the bus beside the driver and Earl reached into the shirt pocket of the bus driver. After this they both came off of the bus. Earl first. And Earl ran up Fayette Street towards the Dixie shop and Ryor ran up Fremont Avenue towards the projects. At this point Frank Harper, who was standing at the Dixie shop with me, said to me, 'Let's follow Ryor.' So then me and Frank ran behind Ryor and we caught up with him on Mulberry Street. * * * And then Ryor opened a little green box which he

had taken off of the bus and in the box was some little papers and some Kennedy half dollars. He gave Frank two of them and me two of them and some other boys some of them. After this I went home and he went towards the Dixie shop. But, before I went home, Ryor gave me the gun back. After I got home, I put the gun in some newspaper and put it in the kitchen table drawer. I haven't seen Ryor or Earl since."

Frank Harper, the first of three witnesses called by the State, testified that while he was looking out the window of the Dixie shop he observed Adams, Mills and Hill playing with a revolver and "saw them walk across the street toward the bus stop and saw a bus approaching." According to him, he saw nothing more until he heard a shot, ran out of the shop and saw "the bus driver slumped in the chair" and saw Earl Hill running "through the projects" with a "shiny object" which appeared to be a money changer.

George McCullum testified that he observed Mills and Hill standing together at the bus stop and Adams standing approximately ten to twelve feet away. He next heard a shot and saw Mills and Hill running from the direction of the bus and when asked about Adams, he stated, "* * * I ain't seen him run nowhere."

Detective George Montgomery testified that he went to appellant's home where he was given a gun which appellant's mother took from a kitchen drawer and that tests at the police crime laboratory disclosed that the bullet recovered from the victim's body was fired from that gun.

It is first contended that the motion for judgment of acquittal should have been granted since, it is argued, the State failed to adduce evidence legally sufficient to overcome the common law presumption that a child under the age of fourteen years is incapable of committing a crime.

Since the Code of Hammurabi (*circa* 2250 B.C.) and down through the ages, society, under the law, has viewed and treated offenders of tender years in a light differ-

ently and more favorably than that accorded adults accused of breaching the law.[1] Over the centuries and during the evolution of the common law of England,[2] there emerged a rule of law governing "the responsibility of infants" under which an individual below the age of seven years cannot be found guilty of committing a crime; an individual above fourteen years charged with a crime is to be adjudged as an adult; and between the ages of seven and fourteen there is a rebuttable presumption that such individual is incapable of committing a crime.[3] In the absence of any pertinent legislative enactment in this State, the common law principles, as stated above, would appear to govern in Maryland and we so hold.[4]

In the case at bar, the appellant was shown to be thirteen years, ten and a half months of age at the time the crime was committed. It was, therefore, incumbent upon the State to produce sufficient evidence to overcome the presumption that the appellant was *doli incapax,* an expression ordinarily employed by the text writers. The proof necessary to meet this burden has been variously phrased: It must be shown that the individual "had discretion to judge between good and evil;" "knew right from wrong;" had "a guilty knowledge of wrong-doing;" was "competent to know the nature and consequences of his conduct and to appreciate that it was wrong." [5] Perhaps the most modern definition of the test is simply that the surrounding circumstances must demonstrate, beyond a reasonable doubt, that the individual knew what he was doing and that it was wrong.

It is generally held that the presumption of *doli incapax* is "extremely strong at the age of seven and diminishes gradually until it disappears entirely at the age

1. See Woodbridge, *Physical and Mental Infancy in the Criminal Law,* 87 U. Penn. L.R. 426.
2. The history of criminal responsibility of children in the English law is discussed in detail in Kean, *History of Criminal Responsibility of Children,* 53 L.Q. Rev. 364.
3. See *Prevatte v. Director,* 5 Md. App. 406, 412.
4. Md. Declaration of Rights, Art. 5.
5. Perkins, *Criminal Law,* at 731.

of fourteen \* \* \*." [6] Since the strength of the presumption of incapacity decreases with the increase in the years of the accused, the quantum of proof necessary to overcome the presumption would diminish in substantially the same ratio.

Judged by these precepts, and on the record before us, we cannot say that the trial judge was clearly erroneous in concluding that the State had met its burden. The judge below, as appears in the record, made a specific finding that "the State has rebutted the presumption \* \* \* with evidence which would convince me beyond a reasonable doubt that this defendant is capable of understanding the nature of his acts and is, therefore, such a person to whom guilt could attach or responsibility could attach for his acts." This conclusion was not precipitously reached by the lower court but was made at the conclusion of the entire trial. It was arrived at only after the trial judge had weighed the demeanor, conduct and comprehension of Adams while being interrogated on the witness stand, prior to trial,[7] by both the court and his counsel concerning his understanding of the right to a jury trial. As announced by the judge, his conclusion that Adams understood the nature of his acts was fortified by analyzing the written statement given by him to the police in which he described, in narrative form, the events surrounding the commission of the crime. After carefully scrutinizing the record before us, we cannot disagree with the conclusion of the lower court that the evidence demonstrated, beyond a reasonable doubt, that Adams, who would have reached his fourteenth birthday in two and a half months, was *doli capax*.

Appellant next contends that the lower court was without jurisdiction to enter the conviction of first degree murder since the conviction was based upon the felony-murder doctrine, *viz.*, an unlawful killing in the course of an armed robbery, and that there was no waiver by

---

6. *Id.*, at 729.
7. The appellant did not testify in his own defense at the guilt or innocence stage of the trial.

the juvenile court of its jurisdiction over the underlying felony of armed robbery. He argues that the juvenile court, absent a waiver of its jurisdiction, as here, had exclusive jurisdiction over the appellant with respect to the underlying felony because he was under the age of sixteen years. We disagree.

Appellant was charged under the statutory,[8] single count form of indictment for murder in the first degree. Since this crime is punishable "by death or life imprisonment," an individual under the age of sixteen, so charged, is excluded from the category of "delinquent child" by the statute governing juvenile causes which was in effect at the date of appellant's trial. See Charter and Public Local Laws of Baltimore City, Flack (1949), Art. 4, § 240 (d) (1).[9] Accordingly, he is subject to trial as an adult.

Md. Code, Art. 27, § 410, provides:

> "All murder which shall be committed in the perpetration of, or attempt to perpetrate any rape, sodomy, mayhem, robbery, burglary, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City jail, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree."

This Court in *Parker v. State*, 7 Md. App. 167, 198, quoting the opinion of the Court of Appeals of Maryland in *Stansbury v. State*, 218 Md. 255, stated:

> "* * * §§ 407, 410 and 411 '* * * do not create any new crime, but merely classify murder, as it was known at common law, into degrees

---

8. Md. Code, Art. 27, § 616.
9. Art. 26, § 70-2(d) (1) of the Md. Code, effective in Baltimore City since June 1, 1969, grants jurisdiction to the juvenile courts in cases where sentences of life imprisonment or death can be imposed whenever the accused is under fourteen years of age. This jurisdiction may be waived by the juvenile court. See § 70-16.

> * * * At common law, a killing in the perpetration of a robbery was murder, regardless of intent * * * As used in the statute, the "common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed * * *" It is perfectly clear that a finding either that the killing was wilful, deliberate or premeditated, or that it was in perpetration of a robbery, would support a verdict of first degree murder.' "

Thus, the fact that a murder is committed during the perpetration of one of the felonies enumerated in Section 410 determines only the degree of the crime and the penalty to be imposed. Proof of facts showing that a robbery was committed is only one of the elements of proof necessary to establish the crime of first degree murder. In effect, there is no difference between proving the felony and proving willfulness, deliberateness and premeditation in a first degree murder case under Md. Code, Art. 27, § 407. The State need only prove the facts that show a felony was committed by the accused which resulted in a killing in order to obtain a legal conviction. There is no necessity for the State to indict and convict the accused of the underlying felony of robbery to sustain a conviction of murder in the first degree. Here, appellant was not charged or indicted or convicted of the underlying robbery. The act that he committed was the participation in the armed robbery which resulted in a killing. Md. Code, Art. 27, § 410, characterizes such an act as murder in the first degree which crime is excluded from the jurisdiction of the juvenile authorities by the Public Local Laws of Baltimore City.

In *Johnson v. State*, 3 Md. App. 105, this Court affirmed the judgment of the lower court convicting a fourteen year old boy of first degree murder under the felony-murder doctrine. Although the precise issue—whether a waiver of juvenile jurisdiction over the underlying felony

is required—was not raised in that case, we said (Footnote 1, page 107):

> "An indictment was also returned against the appellant charging him with robbery but was dismissed upon motion by the appellant on the ground that the Circuit Court of Baltimore City having jurisdiction in juvenile causes had not waived jurisdiction. That Court has no jurisdiction over a "child" who has committed an act punishable by death or life imprisonment. Charter and Public Local Laws of Baltimore City, Flack (1949), Art. 4, § 240 (d) (1). Thus in such case, waiver is not required. See *Bean v. State,* 234 Md. 432."

It is apparent that we were of the opinion then, as we are now, that where a juvenile is convicted of murder in the first degree under the felony-murder doctrine, no waiver of jurisdiction by the juvenile court of the underlying felony is required. In reaching this conclusion we have not overlooked the authorities which hold to the view appellant espouses.[10] We are of the opinion, however, that our conclusion is impelled by the rationale and legislative intent which underlie the relevant statutes governing the exercise of jurisdiction over juveniles in this State.

It is further contended that the evidence was legally insufficient to sustain the judgment of conviction. In reviewing the sufficiency of the evidence in a non-jury case, this Court is governed by Md. Rule 1086 (originally Md. Rule 7(c)). Shortly after the adoption of the original rule, the Court of Appeals of Maryland in *Lambert v. State,* 196 Md. 57, stated (at page 68):

> "That rule was adopted for the purpose of preventing a possible miscarriage of justice by permitting the determination of one judge to take

---

10. For a review of the pertinent authorities, see Perkins, *supra,* at 737-738 and cases therein cited.

away the life or liberty of an accused without a review by any other tribunal. It was not intended, and will not be construed, to permit us to reverse judgments merely because our conclusion on the record is different from that of the trial judge. It is only intended to prevent manifest error."

As Judge Orth, in speaking for this Court, stated in *Williams and McClelland v. State,* 5 Md. App. 450, 457:

"By a long line of cases since *Lambert v. State, supra,* it has been finally established that the test to be applied by the Court of Appeals and this Court in reaching a determination of the sufficiency of the evidence in a non-jury case is whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which the lower court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged."

On the basis of the record before us, which we have carefully studied, we are of the opinion that the evidence before the lower court, as outlined earlier in this opinion, was legally sufficient to support the finding of the trial judge that Ronnie Adams was a principal participant in the armed robbery which resulted in the murder of the robbery victim, Charles A. Snyder. Certainly, we cannot say that the lower court's judgment was "clearly erroneous."

There is no merit in appellant's contention that the denial of his motion for a new trial was error. This is a matter within the sound discretion of the lower court and in the absence of a showing, as here, that there has been an abuse of that discretion, it is not reviewable. *Elder v. State,* 7 Md. App. 368, 373; *Blackstone v. State,* 6 Md. App. 404, 406.

Implicit in our discussion and resolution of the issues raised in this appeal is our belief that the treatment af-

694

forded appellant has been in all respects constitutional. Accordingly, we find no merit in his contention that he was denied due process and equal protection of the law as a result of his trial and conviction.

*Judgment affirmed.*